# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### April 22, 2014 Session

## STATE OF TENNESSEE v. DARYLL SHANE STANLEY

**Appeal from the Criminal Court for Knox County**
**No. 58548     Bobby R. McGee, Judge**

_____

**No. E2013-01739-CCA-R3-CD - Filed October 15, 2014**

_____

Defendant, Daryll Shane Stanley, was charged by presentment with four counts of aggravated rape, one count of attempted first degree murder, two counts of especially aggravated kidnapping, and one count of especially aggravated robbery. Defendant was tried in a bench trial. Defendant appeals from his convictions as charged on all counts except one count of especially aggravated kidnapping, in which he was acquitted. Defendant was sentenced to 25 years for each of his 7 convictions, and his sentences were ordered to be served consecutively for a total effective sentence of 175 years. In this appeal as of right, Defendant raises the following issues for our review: 1) whether the 16-year delay between the presentment of charges and Defendant's trial violated his right to a speedy trial; 2) whether he was denied due process by the State's failure to preserve evidence; 3) whether the evidence was sufficient to sustain Defendant's convictions for four counts of aggravated rape; and 4) whether the trial court's comments at the conclusion of the bench trial indicated that the trial court found Defendant guilty of the lesser-included offense of theft of property in count 8 charging especially aggravated robbery. Having carefully reviewed the record before us, we affirm the judgments of the trial court in counts one through six, but we conclude that Defendant's conviction for especially aggravated robbery in count eight should be modified to a conviction for Class A misdemeanor theft and remand this case to the trial court for entry of a modified judgment.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgments of the Trial Court Affirmed in Part; Modified in Part; and Remanded**

THOMAS T. WOODALL, P.J., delivered the opinion of the Court, in which ALAN E. GLENN and ROGER A. PAGE, JJ., joined.

John Halstead, Knoxville, Tennessee, for the appellant, Daryll Shane Stanley.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Randall Eugene Nichols, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

*Facts*

The victim in this case testified that on May 21, 1994, she was living in an apartment on Citrus Street in Knoxville. Defendant was a "friend of the family" whom she had seen "five or six times." On the night of the incident, she was watching television and eating a snack when Defendant knocked on her door between 11:00 p.m. and 11:30 p.m. She opened the door, and Defendant asked if a mutual friend named Bobby was at her house. She told Defendant that Bobby was not there, and Defendant asked the victim for a glass of water. Defendant and the victim sat on the couch and "talked about different things, just conversation." During their conversation, Defendant suddenly "pounced from one end of the couch to the other" and grabbed the victim's neck. Defendant pinned down the victim and told her to "[s]hut the f*** up or I'm gonna kill you." Defendant told the victim, "I'm gonna f*** you, and then I'm gonna leave. If you don't say anything, I'm not gonna kill you." Defendant put the victim "in a headlock" and forced her into the kitchen. Defendant could not find any knives, but he found a large carving fork and put it against the victim's throat and told her not to scream.

The victim's testimony described the chronology of events as follows. Defendant forced the victim into the bedroom. Defendant "forced [the victim] onto the bed and he raped [her] vaginally." Defendant then sat on the bed "trying to decide what his next move was going to be." Defendant then forced the victim down again "and this time, he raped [her] anally." Defendant found scarves and pantyhose and bound the victim's hands and feet. Defendant taped the victim's mouth with masking tape. Defendant then raped the victim again vaginally. The victim testified, "at some point in time, he raped me again." She testified that Defendant found scissors, and he was straddling her and "nipping at [her] with the scissors" on her breasts. Defendant threatened to cut off the victim's nipples. Defendant was "stroking [the victim's] face and saying, 'I've got your life in my hands right now, I could kill you if I wanted to.'" Defendant was repeating to the victim "over and over again, do you want to die, do you want to live[?]" Defendant choked the victim until she passed out. When the victim woke up, she sat up and "blood spewed out of [her] nose and out of [her] mouth." The tape had come off of the victim's mouth. She testified that the room was dark, but she saw "a figure rushing out." The victim screamed for help. She scooted into her living room, and she saw in a mirror that the scissors were "hanging out of [her] throat." She screamed

again, and the scissors fell out of her neck. She tried to cut herself free with the scissors but was unable to do so. She scooted outside and screamed for help.

The victim testified that she was hospitalized for five days. She suffered pain from her injuries. The victim's eyes were severely bloodshot. She underwent surgery for the wound in her neck. She testified that she was unable to eat solid food until the stitches in her stab wound were removed and her throat healed. She testified that she experienced residual effects from her injuries, including numbness in the left side of her face and ear. She also testified that she suffers from panic attacks, for which she takes medication, as a result of the incident.

During the incident, Defendant told the victim that he was going to take her car and that he needed money. Defendant found the victim's purse and took all of her cash and took her car. The victim later recovered her car in Pensacola, Florida.

Kathy Wrinklestein woke up around 3:00 a.m. on May 22, 1994. She heard the victim screaming for help from outside her bathroom window. Ms. Wrinklestein yelled outside, "lady, are you okay, what's wrong?" The victim responded that she had been raped and stabbed. Ms. Wrinklestein called 911. She woke up her brother-in-law, and they both walked outside and found the victim lying on the grass. The victim's hands were tied behind her back and she was bleeding. Ms. Wrinklestein testified that the victim had been "stabbed in the neck, and her eyes were bleeding." Ms. Wrinklestein covered the victim with a blanket because the victim was not wearing any clothes. Ms. Wrinklestein and her brother-in-law stayed with the victim until the police arrived.

Tammy Yeager was an emergency room nurse on May 22, 1994. Ms. Yeager testified that she reviewed the notes on the victim and learned that the victim had a penetrating wound in her neck, obvious choking trauma, and the victim's thighs were covered in blood and feces. The victim had bruises, contusions, and dried blood all over her body. The victim also had rope burns on her wrists and ankles.

Joe Cox was a crime scene specialist with the Knoxville Police Department at the time of the incident. He photographed the scene and recovered several items, including the scissors, pieces of a scarf and pantyhose, tape, a sheet, the sleeve from a black dress, and a man's white shirt. Several other items were taken from the scene, but Cox testified that none of the items could be located. Cox testified that he lifted a latent print from a glass in the victim's bedroom. Cox went to the hospital to speak to the victim. He observed bruises on the victim's neck, wrists, and ankles. He recovered the rape kit from the hospital, but it had also been lost.

Investigator Tom Styles interviewed the victim at the hospital. Investigator Styles testified that the victim told him that she was raped three times by Defendant. He testified that it was possible he had mistakenly noted in his report that the victim stated she was raped three times and that it may have been more. He also testified that the victim was emotional because "[s]he had been badly mistreated." Investigator Styles testified that the victim's car was located in Pensacola, Florida. He also learned on June 4, 1994, that Defendant was in custody in Oklahoma.

Arthur Bohanan of the Knoxville Police Department examined the latent print lifted from a drinking glass in the victim's apartment and determined that the print matched Defendant's left ring and left middle fingers.

Detective Dennis Davis of the Del City Police Department in Del City, Oklahoma, testified that he interviewed Defendant on June 4, 1994. The video recording of the interview was played for the trial court. The transcript from the interview shows that Detective Davis read Defendant his rights, and Defendant waived his rights. Detective Davis asked Defendant if he had ever hurt a woman before, and Defendant admitted that he had. Detective Davis asked Defendant about a rape charge in Knoxville, and Defendant said he "wouldn't really call it rape." Defendant stated that the victim had consented to having sex with him. Detective Davis asked Defendant if he had hurt the victim or lost his temper with her, and Defendant replied, "Probably did. I lose it sometimes and I don't know where I'm at." Defendant told Detective Davis that he had been staying at the mission in Knoxville, and on the night of the incident, he arrived late and was not allowed to stay there, "so [he] just went and kind of freaked out." Defendant stated that he "probably need[ed] a whole lot of counseling." Defendant explained what occurred between him and the victim as follows:

> I just – I recall – I kind of a – got a little rough at first, I grabbed her. She asked me what I wanted. And I said I was waiting to have sex with her. And that's when she said ok. She said, let's just lay down here on the floor and do it. She wasn't like freaking out or nothing like that and so we went into the bedroom. Then we had sex and stuff and the next thing I know I'm on the road. Freaking out.

Detective Davis asked Defendant if he beat the victim, and Defendant replied, "I really don't know. I'm not going to say I didn't do anything – I just don't know, you know, I freak out." Defendant stated that he did not know what he had done and that he did not know if he had hurt or killed the victim. Defendant stated that the victim had undressed herself after he "told her to and she did." Defendant denied that he tied the victim's hands and feet. Detective Davis asked Defendant if he remembered hurting the victim, and Defendant replied, "I had a feeling . . . I had a gut feeling that I'd done something – pretty bad." Defendant

-4-

stated, "I don't remember what I've done but I had a feeling I'd done something bad. That's why I had to leave [Knoxville]." Defendant stated that he left Knoxville in the victim's car. He stated that he left the victim's car in a parking lot at Pensacola Beach.

Defendant did not testify in his own behalf or present any other proof.

*Analysis*

*Right to speedy trial*

Defendant contends that the trial court erred in denying his motion to dismiss based on a violation of his right to a speedy trial. The United States and Tennessee Constitutions guarantee the criminal defendant the right to a speedy trial. U.S. Const. amend. VI; Tenn. Const. art. I, § 9; *State v. Utley*, 956 S.W.2d 489, 492 (Tenn. 1997). The right to a speedy trial is also statutory in Tennessee. *See* Tenn. Code Ann. § 40-14-101.

When an accused seeks the dismissal of charges based upon the denial of the constitutional right to a speedy trial, the accused must establish a period of delay that is "presumptively prejudicial." *State v. Jefferson*, 938 S.W.2d 1, 12 (Tenn. Crim. App. 1996) (citing *Doggett v. U.S.*, 505 U.S. 647, 651, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992); *Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972)). The length of the delay is dependent upon the peculiar circumstances of each case, and the delay that can be tolerated for "an ordinary street crime" is generally much less than for a serious, complex felony charge. *Barker*, 407 U.S. at 530-31, 92 S. Ct. 2182. A delay of one year or longer marks the point at which courts deem the delay unreasonable enough to trigger further inquiry. *Doggett*, 505 U.S. at 652 n. 1, 112 S. Ct. 2686; *Utley*, 956 S.W.2d at 494.

Clearly, the 16-year delay between the issuance of the presentment and Defendant's trial is sufficient to trigger an analysis of the remaining three factors. The second factor enunciated in *Barker* is the reason for the delay. The reasons for delay generally fall into one of four categories: (1) intentional delay to gain tactical advantage over the defense or delay designed to harass the defendant; (2) bureaucratic indifference or negligence; (3) delay necessary to the fair and effective prosecution of the case; and (4) delay caused, or acquiesced in, by the defendant. The first type of delay (intentional) is weighed heavily against the state. The second type (negligence) is also weighed against the state although not as heavily as deliberate delay. The third type of delay is, by definition, justifiable and is not weighed against either party. The fourth type of delay, which is caused or acquiesced in by the defendant, is weighed against the defendant. *State v. Wood*, 924 S.W.2d 342, 346-347 (Tenn. 1996).

In its order denying Defendant's motion to dismiss, the trial court found that the State was guilty of negligence in causing the delay but that the State did not act intentionally in order to gain a tactical advantage. The State knew that Defendant was in Oklahoma in 1994, yet the State waited until Defendant had completed serving his sentence in Oklahoma before having Defendant extradited to Tennessee. In their briefs, neither the State nor Defendant challenge the trial court's finding regarding the reason for the delay. Defendant asserts that the delay was the result of the State's "gross bureaucratic indifference," and the State acknowledges negligence. From our review of the record, however, we find no evidence of bad faith on the part of the State. Instead, the delay in the instant case resulted from the State's negligence in failing to actively pursue Defendant's extradition so that the charges might be timely prosecuted. This factor must be weighed in Defendant's favor.

The third factor examines whether Defendant asserted his right to a speedy trial. We recognize that "the failure to demand a speedy trial is not a waiver of the right, but is one of the factors to be considered in the ultimate decision . . . ." *State v. Bishop*, 493 S.W.2d 81, 84 (Tenn. 1973). The primary burden is on the prosecutor and the courts to assure cases are brought to trial on a timely basis. Nonetheless, a defendant's assertion or failure to assert the right to speedy trial is a factor in the overall balancing test. In considering this factor, the *Barker* court noted that a defendant's assertion of a speedy trial right is entitled to strong evidentiary weight in determining whether the right has been denied, and failure to assert the right will make it difficult to prove it was denied. *Barker*, 407 U.S. at 531-32.

The trial court found that Defendant acquiesced in the delay. While Defendant acknowledges that he failed to demand a speedy trial during the 16-year delay, he attributes his failure to his limited experience with the criminal justice system and to a "psychotic breakdown" he suffered while incarcerated in Oklahoma. Nevertheless, this factor weighs in favor of the State.

Finally, the trial court found that Defendant failed to show that he suffered any actual prejudice as a result of the delay. Defendant asserts that he was prejudiced by the loss of the audiotape recording of his interview with detectives in Oklahoma; the death of his mother; fading witness memories; the loss of the rape kit; the loss of his ability to have his sentences run concurrently with his sentence in Oklahoma; and the loss of his mental health records. The trial court found that Defendant had failed to show that he suffered prejudice by the delay, and we conclude that the record supports the trial court's finding.

Regarding the audiotape recording of the Oklahoma interview, Defendant argues that it "likely would have provided exculpatory evidence" on the issue of Defendant's mental health at the time he committed the offenses in this case. On cross-examination, Detective Davis testified that he "believe[d] [he] had an audio recorder going, but it didn't record [the

interview].” He testified that if there was an audio recording of the interview, he did not know what happened to it. Thus, initially we note that it is unclear whether the audio recording was lost due to the delay in prosecution, or whether an audio recording of the interview was never even made.

The importance of an audio recording, Defendant contends, is that the video recording of the interview stopped for approximately 11 minutes because Detective Davis had to replace the battery in the recorder. Defendant argues that during that 11-minute gap in the video recording, Defendant made a statement to Detective Davis about hearing voices in his head. Detective Davis testified that his handwritten notes taken during the interview showed that Defendant “stated that he heard a voice in his head about every seven days that tells him to have sex.” He testified that the statement was “probably” made during the 11-minute gap before he realized that the battery needed to be replaced. In its brief, the State raises an issue as to the authenticity of the handwritten notes which were admitted as an exhibit to Detective Davis’ testimony. However, having reviewed the notes contained in the record and the testimony of Detective Davis, we conclude that the record supports that Defendant made the statement that he heard voices in his head.

Nevertheless, we conclude that other evidence in the record does not indicate that Defendant had a mental health issue at the time of the offenses in this case. The presentence report prepared by the Oklahoma Department of Corrections prior to Defendant’s sentencing in 1996, two years after the offenses in this case, indicates that Defendant was admitted into Saint Joseph’s Hospital in Memphis at the age of 16 for counseling, but his parents removed him from the program after two months. The report does not indicate any other mental health history. Defendant underwent a psychiatric evaluation in 1995 to determine his competency to stand trial in Oklahoma. The report concluded that Defendant was competent to stand trial and noted that Defendant was “personality disordered which create[d] difficulties for him (temper, angry at women, poor insight and judgement [sic], tendency to abuse alcohol and drugs, authority problems, etc.).” Defendant asserts that “[t]hat kind of apparently superficial evaluation is not something that should be relied on to foreclose the possibility that [Defendant] had a mental health problem at [the time of the offenses].” We do not make that determination however. We only examine whether Defendant was prejudiced by the apparent loss of an audio recording of his statement to Detective Davis that he heard voices telling him to have sex, and we conclude that Defendant was not prejudiced.

Defendant also did not suffer prejudice due to the death of his mother in 2003. Defendant asserts that his mother “could have fleshed out the conversation she had with [Defendant]” one week before the offense in this case in which he told his mother that he needed to go to the hospital because he was “freaking out.” Defendant told Detective Davis during his interview that “about a week ago, before I even got on the road I asked my mom

-7-

if it would cost anything to go to a hospital. You know for some counseling." The State argues that had Defendant's mother testified at trial, she could have corroborated Defendant's statement, but the absence of her corroboration did not prejudice Defendant. We agree with the State. Defendant's statement was presented to the trial court as evidence. Defendant has failed to state how he was prejudiced.

Defendant also asserts that he was prejudiced by fading witness memories. Defendant cites Ms. Wrinklestein's inability to recall who gave her the blanket or sheet she used to cover the victim when she found her in the grass; the victim's inability to recall what she said to investigators on the day of the attack; crime scene specialist Joe Cox's inability to recall certain details of the investigation, including whether the rape kit was sent to the Tennessee Bureau of Investigation; and Officer Cole's inability to recall whether he cut the pantyhose off of the victim's hands and feet. However, in light of the overwhelming evidence in this case, we are unable to see how these deficiencies in witnesses' memories prejudiced Defendant.

Similarly, the loss of the rape kit in this case did not prejudice Defendant because, as the State points out, Defendant admitted that he had sex with the victim. Defendant told Detective Davis, however, that the sex was consensual. Defendant also admitted that he drove the victim's car to Florida. Therefore, Defendant's identity was not an issue in this case.

Defendant asserts that he was prejudiced by the delay in prosecution because he lost the ability to have his sentences in this case run concurrently with his Oklahoma sentences. Our supreme court has held that it did "not agree that the lost possibility of concurrent sentencing is enough in and of itself to require dismissal on speedy trial grounds." *State v. Simmons*, 54 S.W.3d 755, 761 (Tenn. 2001). The court in *Simmons* found that the defendant failed to show a "statute mandating concurrent sentences," and that he had failed to establish that he "probably would have obtained concurrent sentences, or that he was a favorable candidate for concurrent sentencing." *Id*. The same is true in this case.

Finally, Defendant asserts that he was prejudiced by the loss of mental health records. Defendant argues that the unavailability of the following records prevented him from presenting a mental health defense: records from Saint Joseph's Hospital, where he was admitted for two months at the age of 16; records from Job Corps in Knoxville from 1992 and 1993; records from "group homes" Defendant stayed at as a child; and records from Oklahoma Department of Corrections kept during Defendant's incarceration.

The Oklahoma presentence report shows that Defendant was admitted to Saint Joseph's Hospital at the age of 16 (1987 or 1988) "for counseling but his parents removed him from the program after two (2) months." The report also states that Defendant was diagnosed as

being "hyperactive" at the age of 18 months and that his mother "advised that the diagnosis today would be Attention Deficit Disorder." Defendant asserts that he tried to obtain his records from Saint Joseph's Hospital and was informed that the records were no longer available because records are destroyed after ten years. These records would likely have been available in 1996 when the presentence report was prepared. Also, Defendant's mother presumably had an opportunity to explain Defendant's mental health condition when the presentence report was being prepared, and she only stated that Defendant had Attention Deficit Disorder. Defendant has not shown how the unavailability of these records prejudiced him.

Defendant argues that "[i]t is certainly possible that the Job Corp records could have contained mental health evaluations as part of the process of determining the need of individuals in the program." However, Defendant has not provided anything to show that a mental health evaluation was performed or that Job Corp regularly conducts mental health evaluations. Therefore, Defendant has not shown prejudice. Similarly, Defendant has not shown prejudice due to the lack of records from the group homes he attended as a child. There is nothing in the record to indicate that Defendant underwent mental health evaluations from the group homes or that he was required to do so.

Finally, the record contains Defendant's mental health records from the Oklahoma Department of Corrections from 2001 to 2010. Defendant argues that he was prejudiced by the loss of records for the period of 1997 to 2001. Defendant presumes that records for Defendant were kept during that time period. An affidavit by a manager of the records for the Oklahoma Department of Corrections states that "there are no other records in my possession[.]" Defendant asserts in his brief that "there is no question that any other records simply no longer exist due to the passage of time." However, there is nothing to indicate that the Oklahoma Department of Corrections destroys records or that records for Defendant prior to 2001 ever existed. As the State points out, the absence of records prior to 2001 could indicate that Defendant did not begin displaying mental health issues until 2001. We cannot conclude based on the record before us that Defendant suffered prejudice from the absence of these records.

Weighing all of the *Barker* factors, we conclude that there has not been a denial of Defendant's Sixth Amendment right to a speedy trial. Defendant is not entitled to relief on this issue.

*Ferguson issues*

Defendant next contends that the loss of evidence in this case, specifically the audiotape recording of his interview in Oklahoma and the rape kit, deprived him of a

fundamentally fair trial and violated his due process rights as outlined in *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999).

In *Ferguson*, our supreme court "explained that the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial." *State v. Merriman*, 410 S.W.3d 779, 784 (Tenn. 2013) (citing *Ferguson*, 2 S.W.3d at 915-16. The court observed that "the due process required under the Tennessee Constitution was broader than the due process required under the United States Constitution" and rejected the "bad faith" analysis espoused by the United States Supreme Court in favor of "a balancing approach in which bad faith is but one of the factors to be considered in determining whether the lost or destroyed evidence will deprive a defendant of a fundamentally fair trial." *Merriman*, 410 S.W.3d at 784-85 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988) (holding that "[u]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law"). Our supreme court "observed that fundamental fairness, as an element of due process, requires a review of the entire record to evaluate the effect of the State's failure to preserve evidence." *Id*. at 784-85 (citing *Ferguson*, 2 S.W.3d at 914, 917).

To facilitate this "balancing approach," our supreme court ruled that the trial court must first "determine whether the State had a duty to preserve the evidence," *Merriman*, 410 S.W.3d at 785, and observed that the State's duty to preserve was "limited to constitutionally material evidence." *Id*. The court held that to be "constitutionally material," the evidence "must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id*. (citing *Ferguson*, 2 S.W.3d at 915, 918). "If the trial court determines that the State had a duty to preserve the evidence, the court must determine if the State failed in its duty." *Merriman*, 410 S.W.3d at 785 (citing *Ferguson*, 2 S.W.3d at 917). If the trial court concludes that the State lost or destroyed evidence that it had a duty to preserve, the trial court must then consider three factors to determine the appropriate remedy for the State's failure: (1) [t]he degree of negligence involved; (2) [t]he significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and (3) [t]he sufficiency of the other evidence used at trial to support the conviction. *Merriman*, 410 S.W.3d at 785 (quoting *Ferguson*, 2 S.W.3d at 917). "If the trial court concludes that a trial would be fundamentally unfair without the missing evidence, the trial court may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." *Merriman*, 410 S.W.3d at 785-86.

We review the trial court's decision concerning the fundamental fairness of a trial conducted without the missing evidence under a de novo standard of review. *Id*. at 791. If

this court concludes that the trial would be fundamentally unfair in the absence of the lost evidence, this court will apply an abuse of discretion standard to review the appropriateness of the remedy imposed by the trial court. *Id*. at 792.

With respect to the audio recording of Defendant's interview with Oklahoma authorities, we have already observed that there is nothing in the record to indicate that an audio recording ever existed. The State has a duty to preserve evidence in its possession. Detective Davis testified that he did not know whether the interview was being audio recorded or just video recorded. Also, he testified that if an audio recording was made, he did not know what happened to it. The State asserts that there is nothing in the record to show that an audio recording was provided to the State by the Oklahoma authorities. The State is required to disclose to the defendant and make available for inspection or copying, any of the defendant's recorded statements if "the statement is within the [S]tate's possession, custody or control." Tenn. R. Crim. P. 16(a)(B)(i)(I). Furthermore, "the prosecutor's duty to disclose extends not only to material in his or her immediate custody, but also to statements in possession of the police which are normally obtainable by "exercise of due diligence." *State v. Hicks*, 618 S.W.2d 510, 514 (Tenn. Crim. App. 1981). There is nothing in the record to indicate that the State possessed and lost an audio recording of the interview or that the State could have obtained it from Oklahoma police through the exercise of due diligence. Detective Davis could not recall whether an audio recording was made or what happened to it if it was made.

Defendant also argues that the trial court should have granted his motion to dismiss based on the State's loss of the rape kit. The State acknowledges that it had a duty to preserve the rape kit and that failure to do so was negligence. Defendant argues that the rape kit had exculpatory value; however, as we noted earlier in this opinion, Defendant admitted in his videotaped interview that he had sex with the victim and left in the victim's car afterward. Therefore, the identity of Defendant was not at issue in this case. Defendant told investigators that he had consensual sex with the victim. However, the evidence at trial was overwhelmingly sufficient to prove that the victim did not consent. In light of the evidence at trial, including the victim's testimony, the neighbor's testimony, evidence of the severity of the victim's injuries, and Defendant's own statement, we conclude that the loss of the rape kit did not deprive Defendant of a fundamentally fair trial.

*Sufficiency of the evidence*

Defendant contends that his convictions for counts two and four of the presentment, both alleging anal rape, are not supported by the evidence. Alternatively, Defendant argues that if counts two and four are considered different theories of the same offense, the two counts should have been merged into a single conviction. The State responds that the proof at trial supports four separate convictions for aggravated rape and that any variance between

the presentment and the proof at trial is not fatal, and Defendant did not suffer prejudice as a result of the variance.

The presentment alleged four counts of aggravated rape under Tenn. Code Ann. § 39-13-502. Two counts alleged aggravated rape by vaginal penetration, and two counts alleged aggravated rape by anal penetration. The victim testified at trial that Defendant raped her once vaginally, then once anally, then vaginally again, and she testified that Defendant raped her a fourth time, but she did not testify whether the rape was vaginal or anal.

We disagree with Defendant's contention that the proof is "constitutionally insufficient as to one of the counts of anal rape." When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). The trier of fact, not this court, resolves questions concerning the credibility of the witnesses, and the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this court reweigh or re-evaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id.* Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of [the] evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

Viewing the evidence in the light most favorable to the State, the evidence is sufficient to support four separate offenses of aggravated rape. The victim testified that Defendant raped her four times. With respect to the fourth aggravated rape, she testified that he "raped [her] again." She testified that the rapes were painful and caused tearing and blood. While the victim did not specify, as she did with the other three rapes, whether the fourth rape was by vaginal or anal penetration, any rational trier of fact could have found that Defendant committed four separate aggravated rapes against the victim.

Defendant suggests that counts two and four were alternate theories of the same offense and should have been merged into a single conviction. When the State proceeds under alternate theories of a crime, those offenses must be merged due to double jeopardy concerns. *State v. Hurley*, 876 S.W.2d 57, 70 (Tenn. 1993); *State v. Addison*, 973 S.W.260, 267 (Tenn. Crim. App. 1997). In this case, the evidence clearly supports four separate counts of aggravated rape.

Defendant also argues that "the proof was constitutionally insufficient as to one of the counts of anal rape" due to a variance between the presentment and the proof at trial. "A variance between an indictment or a subsequent bill of particulars and the evidence presented at trial is not fatal unless it is both material and prejudicial." *State v. Shropshire*, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000) (citing *State v. Moss*, 662 S.W.2d 590, 592 (Tenn. 1984)). A variance between an indictment and the proof in a criminal case is not material where "the allegations and proof substantially correspond, the variance is not of a character which could have misled the defendant at trial and is not such as to deprive the accused of the right to be protected against another prosecution for the same offense." *Moss*, 662 S.W.2d at 592; *see also State v. Mayes*, 854 S.W.2d 638, 640 (Tenn. 1993). A defendant must demonstrate prejudice in the form of unfair surprise or inability to prepare an adequate defense. *State v. Sherman*, 266 S.W.3d 395, 409 (Tenn. 2008) (citing *State v. Byrd*, 820 S.W.2d 739, 741 (Tenn. 1991)).

We conclude that the variance between the presentment in this case and the proof at trial was neither material nor prejudicial to Defendant. The presentment was sufficient to inform Defendant that he was accused of committing four counts of aggravated rape against the victim. Whether the fourth rape that the victim testified to was vaginal or anal was not material. Defendant is not entitled to relief on this issue.

*Ambiguity in court's verdict*

Finally, Defendant asserts that the trial court erred by entering a judgment of conviction in count eight charging especially aggravated robbery, where the trial judge made the following comments at the conclusion of the bench trial:

> In count eight, clearly, he did – he did commit theft – felony theft against her. I don't know if there's an amount, let's just say felony theft and I guess without any indication of an amount, it will have to be class E felony theft, but the court will find him guilty of that count.

At the sentencing hearing, Defendant argued that he should be sentenced for misdemeanor theft in count eight because the court found him not guilty of especially aggravated robbery, but rather the lesser-included offense of felony theft, and there was no proof of the value of the property taken from the victim. The trial court noted that it had not used a verdict form, and the trial court attempted to clarify its verdict in count eight,

> I'm pretty sure what I was talking about was that in order to find someone guilty of robbery, there has to be a theft, and I was just remarking somewhat idly, I think, that I didn't know what grade of theft it was, but it wouldn't –

-13-

nevertheless and the – and whatever degree of theft it was, it was theft accomplished by force, the use of a deadly weapon, and serious bodily injury was a result or was committed during the theft, and that I – I'm – it's my recollection that although I wasn't sure what level of theft it was, and it – it certainly was theft and that made it – considering – considering the weapon and the injuries, that made it especially aggravated robbery.

Defendant interprets the trial court's comments as a finding that Defendant was not guilty of especially aggravated robbery, but rather felony theft. The trial court's comments as to count eight are confusing, and we agree that without a verdict form, it is difficult to decipher what the trial court intended by the comments. While the trial court stated that it found Defendant "guilty of that count," the only offense mentioned by the trial court as to that count was "class E felony theft." As to the other counts in the indictment, the trial court stated the offenses in announcing its verdict. For example, the trial court stated, "[i]n count three, aggravated rape vaginally, the Court finds the defendant guilty." We also note that during the court's announcement of the verdicts, there were several times the prosecutor interjected to correct or clarify the counts of the presentment to the court; however, during the court's announcement in count eight, the prosecutor remained silent. There was opportunity for the prosecutor to ask for clarification regarding the court's verdict in count eight, and the State's failure to request clarification weighs in favor of Defendant.

The State notes that the court minutes reflect that the trial court found Defendant guilty of especially aggravated robbery. Ordinarily, when conflicts exist between evidence transcripts and court minutes, the transcripts control. *State v. Clark*, 67 S.W.3d 73, 79 (Tenn. Crim. App. 2001) (citing *State v. Moore*, 814 S .W.2d 381, 383 (Tenn. Crim. App. 1991)).

We conclude that the trial court's comments during its announcement of the verdict indicate that the trial court found Defendant guilty of felony theft. The value of the property taken is not a required element for a finding of guilt for especially aggravated robbery. *See* Tenn. Code Ann. §§ 39-13-401(a), -403(a). In announcing its verdict in count eight, the trial court did not mention any of the required elements of especially aggravated robbery (the use of a deadly weapon and serious bodily injury to the victim), as it later did at the sentencing hearing. In a similar situation involving a jury trial, where the jury announced a verdict of "not guilty," and the jury was discharged, in effect ending the trial, this Court held that the trier of fact (the jury) could not later correct a mistake to impose guilt of a lesser included offense. *See State v. Green*, 995 S.W.2d 591 (Tenn. Crim. App. 1998).

We therefore modify Defendant's conviction for especially aggravated robbery to a conviction for misdemeanor theft because there was no proof at trial of the value of the victim's car.

-14-

In conclusion, we affirm the judgments of the trial court as to counts one through six. We modify Defendant's conviction in count eight to Class A misdemeanor theft and accordingly set his sentence at 11 months and 29 days. This case is remanded for entry of a modified judgment.

_____
THOMAS T. WOODALL, JUDGE